## THE LISNACRIEVE.

### GRASSO v. THE LISNACRIEVE.

(District Court, E. D. New York. May 2, 1898.)

SHIPPING—MASTER AND SERVANT.

Where the owners of a ship furnish a winchman to assist in unloading, they are liable to an employé of the stevedore, who is unloading the ship under a contract, for injuries caused by the negligence of the winchman, although they were under no contractual obligation to furnish the winchman, and although such winchman is working under the orders of the stevedore.

This was a libel in rem by Mattee Grasso against the steamship Lisnacrieve, to recover damages for personal injuries.

Francis L. Corrao, for libelant.

Convers & Kirlin, for claimant.

THOMAS, District Judge. On the 17th day of August, 1896, the libelant, a longshoreman, was working aboard the steamship Lisnacrieve, under the employment of T. Monaghan, a stevedore, with whom a contract had been made by the charterers to discharge a cargo of asphalt. The ship was lying at the foot of Fifty-Second street, in the city of New York. The asphalt was brought up from the hold of the vessel by means of iron tubs, furnished by the contracting stevedore, hoisted by means of a block and tackle, passing to one of the winches of the vessel, which was run by one of the seamen of the vessel's crew. The libelant, together with other longshoremen, was engaged in the lower part of the cross bunker hold of the steamship, loading asphalt into the tubs, dragging them towards, but not directly under, the hatchway, and fastening the hook attached to the line to the bail of the tub. A gangwayman, with an assistant, employed by the stevedore, was stationed at the mouth of the main deck hatch of the hold, whose duty it was to guide the tubs as they were hoisted out of the hold, so as to prevent them from catching against the coamings or other obstructions, and also to give signals to the winchman of the No. 3 winch when to start and when to stop, these signals being given by means of a whistle, as the winchman was not in sight of the gangwayman. It appears that the casement of the donkey boiler protruded beneath the hatch into the hold of the vessel, and that a man in the employ of the stevedore was stationed upon such casement, to prevent the tub striking the casement in its descent, and to steady the tub, until it reached the top of the casement, and thereafter give it proper direction. When it had been thus steadied, and was in a proper line of the hatch opening, it was allowed to proceed rapidly upon its way out of the hatch. When the tub was ready to be lifted from the bottom of the hold, one sharp whistle was given by the gangwayman on the main deck. This meant that the winchman should start easily and go slowly. When the tub reached the top of the casing, if it was not in proper position, another signal was given, which meant that the winch should be stopped, to allow the person stationed on the casing to adjust the position of the tub to the opening above. This having been done, a long reverberating whistle was

given, which indicated that the winch should go rapidly, to carry the tub onto the main deck. Generally speaking, speed was desirable, as it expedited the fulfillment of the stevedore's contract.

It is claimed on the part of the libelant that he was injured in the following manner: A tub, drawn partially towards, but not directly under, the open hatch, received the hook, and the signal to start and go easily was given. Instead of starting slowly, the winchman started rapidly, causing the tub to swing into the hatch, and oscillate from one side to the other, in a dangerous manner, and so as to strike against the casing about the boiler, or the coamings of the hatch, or both. The gangwayman, seeing this condition, gave a signal to stop, but the winchman did not stop, and thereupon the gangwayman gave three more shrill whistles, indicating, as he says, that the winchman should stop, but the tub was drawn up through the open hatchway. While the tub was making this passage, one or more pieces of asphalt fell from it, striking the libelant, who was in the hold below.

The evidence seems to be preponderating that, in first lifting the tub from the bottom of the hold, the custom was to go slowly, and that previous to this time the winchman had observed that custom. The libelant shows by several witnesses that the winchman lifted the tub in question with an unusually rapid motion, and it appears fairly that the unusual swinging motion was given to the tub by the rapidity of the motion thus imparted. If this evidence is to be believed, the winchman was negligent. And as the claimant produces no satisfactory and competent evidence of due speed, but rather relies upon inferences to be drawn from the previous good work, capacity, and skill of the winchman, the evidence of the libelant in this regard must be accepted. Therefore, as the negligent act of the winchman is a sufficient cause for the injury, the question remains whether the claimant must respond for this negligent act.

It is a rule well settled that, although a person undertakes to do an act gratuitously, yet he is not relieved from using suitable care in so doing. And although the ship in the present case equipped and operated the winch without being constrained thereto by any contractual obligation, yet the undertaking imposed the duty of due care.

It is said that the winchman, although furnished by the shipowners, was not at all under their charge or direction, but for the time was in the service of the contracting stevedore, subject to his orders, and that he thereby became a fellow servant of the libelant, and that if, therefore, the accident happened from the negligence of the winchman, it was the negligence of a fellow servant, for which neither the contracting stevedore nor the shipowners would be liable.

The stevedore made his contract with the charterers, and it does not appear who was to furnish engines for hoisting and men to operate the same. The claimant contends that the stevedore stated that he could not get a man to properly drive the winch, and that thereupon the ship furnished the winchman in question. The day previous to the accident, however, as the winches were otherwise in use, the ship employed a floating engine and an engineer to do the same work, and bore the expense thereof. This would seem to indicate some sense of obligation on the part of the shipowners to

furnish the hoisting power. In any case, the ship did undertake to do a certain portion of the work of unloading. Such an undertaking is not merely loaning a servant to the stevedore. It is a co-operation on the part of the ship in the work of unloading the cargo, precisely to the same extent as if two independent stevedores had contracted for a division of labor in discharging the cargo, one furnishing the tackle and hoisting power, and the other furnishing men and appliances for the remainder of the work. It does not change this relation that the winchman was to run his winch, or stop his winch, or graduate the speed thereof, as the stevedore's servant signaled him to do. Independent contractors and their servants are often called upon to direct and advise each other in movements and acts relating to the common work, and such often is the case between the contractor and the person with whom the contract is made. The fact that the servant of one of the parties regulates his acts by the actions of the servants of the other does not make them co-servants. In the present case the winchman was a general servant of the ship. He was put in charge of the ship's machinery, to perform a duty that the ship had assumed the duty of performing. He went to his post of duty, or left the same, by no command of the stevedore, but simply because his master or his delegated agent so directed him. True, the stevedore gave him a signal, and it was his duty to obey it; but this duty sprang from no contract of hiring made by the winchman with the stevedore, but purely or wholly from the relation of master and servant that existed between the winchman and the shipowners. When the stevedore signaled him to hoist, he was at perfect liberty to disobey this order, so far as the stevedore was concerned, and the stevedore was helpless. Nay, if the stevedore had signaled him to hoist, and his master had directed him not to hoist, is there any doubt to whom he owed and would have rendered obedience? There is no lending of a servant or subhiring of a servant in this case. The master, in effect, said to his servant: "I have undertaken to furnish the power and operators of the power to hoist the cargo from the hold. The stevedore is engaged to do the remaining work. You will take charge of the winch and operate it, co-operating, by means of signals, with the stevedore's servants." The stevedore had not selected the winchman. The shipowners chose him. The stevedore was obliged to take him or no one. The ship alone had knowledge of his competency; had alone investigated or tested it. The ship placed or retained him in charge of the winch. The stevedore could not send him to or from it. The stevedore did not pay him, and could not discharge him.

Assume that a person, not connected with the ship, but having a right to pass along the deck thereof, had, while so doing, been injured by the stevedore's culpably negligent operation of the winch; would it have been an excuse for the ship that it had for a while loaned this winch and winchman to a stevedore? Assume that another of the ship's servants had been injured by the winchman's culpable negligence; could such servant have recovered against the shipowner, upon the ground that the winchman had been borrowed by a stevedore, and that, therefore, the former and general relation

of master and servant was so in abeyance that the doctrine of the negligence of co-servants would not apply?

There has been some diversity of judicial opinion in similar cases; but the difficulty has arisen at times from not sufficiently recognizing that, instead of loaning or subhiring a servant, the master himself has undertaken to perform a portion of the work. Cases may well arise where the servant of one person is engaged to assist another in respect to work in which the master had no interest. In such a case the servant would be temporarily released from his usual employment, and would ally himself to a new master, and recognize obedience to such master. It will be observed that, in such a case, it would be quite within the power of the new master at his will to end the service of the servant. But in the present case the stevedore could not order the winchman to leave the winch. He could not replace him by another operator. In fact, he had no power over him whatever except through the will and direction of the owners of the ship.

It would not be useful to review the authorities. The following decisions support, or tend to support, the conclusion above reached: Johnson v. Navigation Co., 132 N. Y. 576, 30 N. E. 505; Coyle v. Pierrepont, 33 Hun, 311 (see holding on reargument); Higgins v. Telegraph Co., 8 Misc. Rep. 433, 28 N. Y. Supp. 676 (the opinion in this case is instructive); Kilroy v. Canal Co., 121 N. Y. 22, 24 N. E. 192, distinguishing Murray v. Currie, L. R. 6 C. P. 24; The Harold, 21 Fed. 428; Sanford v. Oil Co., 118 N. Y. 571, 24 N. E. 313; Sullivan v. Railroad Co., 112 N. Y. 643, 20 N. E. 569, affirming 44 Hun, 304; Svenson v. Steamship Co., 57 N. Y. 108; King v. Railroad Co., 72 N. Y. 607 (see facts and opinion 66 N. Y. 181); Davi v. Victoria, 69 Fed. 160.

The claimant calls attention to Transport Co. v. Coneys, 28 C. C. A. 388, 82 Fed. 177, which is easily distinguishable from the case at bar; Murray v. Currie, L. R. 6 C. P. 24, distinguished in Kilroy v. Canal Co., supra; Rourke v. Colliery Co., L. R. 1 C. P. Div. 556, on appeal L. R. 2 C. P. Div. 205; Donovan v. Laing [1893] 1 Q. B. 629; Johnson v. City of Boston, 118 Mass. 114; Ewan v. Lippincott, 47 N. J. Law, 192; Railway Co. v. Cox, 21 Ill. 20.

The principles stated in some of these cases are of general application, and some of the cases do not necessarily conflict with the view here adopted, that the master of the offending servant was himself taking a part in the work, and was not merely parting temporarily with the services of a person in his general employment. So far, however, as such cases apparently conflict with the views here expressed, they are deemed also in conflict with the federal decisions and those of the courts of the state of New York. To the cases stated as above by the claimant may be added Rook v. Concentrating Works, 76 Hun, 54, 27 N. Y. Supp. 623.

Pursuant to this opinion, decree should be entered for the libelant for an amount that shall fairly compensate him for his injuries. A suitable examination of the evidence leads to the conclusion that the sum of $750 would be reasonably compensatory, for which let a decree be entered, with costs.