ALBERT WARD, Administrator,

*vs.*

MAINE CENTRAL RAILROAD COMPANY.

Androscoggin.    Opinion January 17, 1902.

*Railroad.    Negligence.    Proximate Cause.    Damages.    Stat. 1891, c. 124.*

It is too well settled in this state to permit of discussion, that whenever a plaintiff's want of ordinary care contributes as a proximate cause to the injury for which he brings suit, he cannot recover. In such case the degree of his negligence, or the extent of its effect, as one of the causes for the injury is of no consequence. More than this, the burden is upon him to show affirmatively that no want of ordinary care upon his part contributed in the slightest degree to the injury of which he complained.

But, it is equally well settled that this mere negligence will not prevent a recovery, unless that negligence contributed to some extent, however slight, as a proximate cause for the injury. So that, although a plaintiff may have been negligent, and his negligence may have afforded an opportunity for the injury, if it precedes the injury, which is caused by a defendant's subsequent and independent negligence, then such negligence upon the part of a plaintiff will not prevent a recovery by him. It is not a question of degree of care or extent of negligence. It is not enough that a defendant might by the exercise of due care upon his part have avoided the consequences of the plaintiff's negligence, when that negligence is contemporaneous with the fault of the defendant.

But, if a plaintiff's negligence is so remote as not to be a proximate cause contributing to the injury, then a defendant's failure to exercise due care to avoid the consequences of the plaintiff's earlier and remote negligence, when by the exercise of such care, it could have been avoided, will render

the defendant liable. This rule is firmly established in this state by a number of comparatively recent decisions, and we believe it to be a wise and salutory one when carefully and properly applied.

In an action against the defendant railroad, under Stat. 1891, c. 124, to recover damages for the death of the plaintiff's intestate, the following facts appear, after verdict for the plaintiff upon a motion for a new trial:

The defendant's passenger station building, at the Freeport station is between its main-line tracks on the south and its freight tracks on the north, and is about two hundred feet westerly of Bow Street, a street running southerly from the village of Freeport, and which crosses the railroad tracks at about a right angle. A platform extends from the station building, along one of the main tracks, westerly. Near by to Bow street between the northerly side of this platform and the nearest freight track, there is an open space extending from Bow street to the station building, nineteen and one-half feet wide at the street and thirty-two and one-half feet wide at the platform on the easterly side of the station building. This open space is used as a passageway and driveway for persons having occasion to drive to the station, and the whole of the space is open and suitable for this purpose. Access to this open space or driveway is had from Bow street, and also by driving over the freight tracks where there are plank-crossings, westerly of the street and nearer the eastern end of the station.

On the day of the accident, in the forenoon, the plaintiff's intestate drove along Bow street, southerly from the direction of Freeport village to the gate at the railroad crossing north of the freight track, in an open wagon with a barrel of potatoes in the wagon, back of the seat. When he reached the crossing this gate was down, a freight train having previously arrived from Portland, which at that time and before had been upon the different freight tracks, the trainmen being engaged in shifting cars and making up the train to proceed easterly. Just previous to this the locomotive had backed in westerly from the street towards the freight house west from the passenger station and the gatekeeper raised the gates upon both sides of the crossing to allow the deceased to pass upon the highway. The deceased drove across the freight track and then turned into the driveway to the station. After driving to within about ten feet of the platform on the easterly side of the station building, he backed his wagon up to the platform extending along the main track towards Bow street, for the evident purpose of unloading the barrel onto this platform. His horse's head therefore was towards the main freight track. Before unloading the barrel, he went forward towards the freight track so that he could look by the passenger station, undoubtedly for the purpose of seeing where the freight train then was and what was being done with it. About this time, the freight train started easterly on the main freight track in the direction of Bow street, making the usual noises caused by ringing the bell, the escape of steam, etc. Thereupon, the plaintiff's horse became to some extent frightened, and the deceased took hold of the horse's bridle and attempted to hold him. There is some differ-

ence in the description by the eye-witnesses as to the conduct of the horse and as to what extent he showed evidences of fright; some of the witnesses, those for the defense, say that the horse was all the time under control until the last plunge which resulted fatally for the deceased ; and this is undoubtedly true to the extent that the deceased continued to keep his hold on the horse's bridle and to remain upon his feet; but beyond this it appears from the evidence that the horse had quite as much control over the man as the man did over the horse. He was moving about all of the time. As one witness expressed it, "the horse was in motion all the time, and was moving Mr. Ward [the deceased] first one way and then the other by his head." In further describing the scene, the same witness said : "The horse once made a plunge with Mr. Ward and came up so that once, as near as I could tell, his foot struck the rail, and he made a surge and drew his horse back again."

As soon as the engineer in his cab got abreast of the easterly end of the passenger station, and perhaps a little before that time, he could, and did, see the condition, whatever it was; he saw that there was some trouble, and shut off the steam, so that after that the train "drifted along," as he expressed it, without steam, and consequently without the noise caused by the escape of the exhausted steam from the cylinder, but the bell continued to be rung until just before the collision. · The deceased's horse continued to show more or less signs of fright, and to move about more or less violently, until finally he made a plunge obliquely towards the track a few feet in front of the locomotive and threw the deceased onto the track. The engineer at once reversed his engine and gave it steam, but this was too late and the deceased was run over by the locomotive and immediately killed.

*Held;* that the deceased went there upon business connected with the railroad company, to leave the barrel of potatoes to be transported by the railroad company, and he was therefore properly there, and was not a mere licensee upon the premises for his own convenience.

*Also;* that even if the plaintiff's intestate was negligent, under all of the circumstances of the case, in driving up to the station platform, when a freight train was upon the track, still a recovery may be had by the plaintiff, notwithstanding that negligence, if subsequently, the deceased being in danger by reason of the fright of his horse, and this danger being apparent to the defendant's engineer, the latter failed to exercise that care which the situation demanded. Nor can it be said, after a verdict by the jury to the contrary, that it was negligence upon the part of the deceased not to have attempted to cross the tracks over the crossings near the eastern end of the passenger station and thus avoided the danger. This would depend upon many conditions and circumstances. It might have been an imprudent thing for him to have attempted to cross at this place in front of an approaching train with a frightened horse.

The question, then, for the jury being whether the engineer should have stopped his train, as it is admitted that he might have easily done,

before the horse finally threw the deceased upon the track in front of the locomotive, it is considered by the court that the finding of the jury was not manifestly so erroneous as to show that the jury in finding for the plaintiff was affected by sympathy, prejudice or some other improper motive; and that a jury would be authorized in finding that the deceased used the same degree of care that a reasonably careful and prudent man would have done in that situation.

While it is in the province of the jury to fix the amount of damages sustained by those for whose benefit this action may be maintained under the statute, "with reference to the pecuniary injuries resulting to them from such death," it is the duty of the court, if the amount awarded is clearly excessive, to set aside the verdict or to fix a sum for an amount beyond which the verdict may not stand. This sum is not necessarily what the court would award as the amount of damages, but the maximum amount which is authorized by the evidence. In this case, we think that such maximum is the sum of $1250.

Case for negligence under stat. of 1891, c. 124, for causing the death of one Albion Ward upon the defendant's station grounds at Freeport village. The jury returned a verdict for $2,031.81. The facts appear fully in the opinion.

*E. Foster, O. H. Hersey; H. E. Coolidge,* for plaintiff.

*W. H. White and S. M. Carter,* for defendant.

Mr. Ward had a right to go down into that roadway if he saw fit to do so, but whether it was a prudent thing to do, whether he was in the exercise of due care in so doing, is another question. A much less degree of prudence than what we call ordinary care would have required him to wait until the engine had pulled out, and it was little less than recklessness for him to drive in there under such circumstances and with such a horse. *Flewelling* v. *Lewiston & Auburn Horse R. R. Co.,* 89 Maine, 585; *Keeley* v. *Shamley,* 140 Pa. St. 213; 23 Am. St. Rep. 228; *Louisville* v. *Nashville Ry.* v. *Schmidt,* 81 Ind. 264. Ward not only drove down to the station, but he refused to avail himself of a plain and easy method of escape after he had walked out and looked at the train. The company had a right to use this track No. 3 for the purpose of running its trains as it did upon that morning. It had a right to start the engine and cars from the freight house and run out through the yard with the reasonable and usual noises incident to their operation. If the horse

became frightened, the company was not responsible for that. So far as the conduct of the company and its servants in this case is concerned, it would have stood just the same if the horse had become frightened from some entirely independent cause. There is no allegation of any negligence in this respect, and no evidence to support any. Elliott on Railroads, § 1175. The plaintiff's want of due care must have been a proximate cause of his injury. It need not be the only proximate cause. A proximate cause is such an act, as a man might suppose, would naturally or probably produce a given result. Where such result happens, the act done by the party which he might naturally or probably have supposed would produce the result, is its proximate cause. Beach Contrib. Negligence, § § 25 et seq. and 54 et seq. The negligence of Ward in driving in there with a horse of that character was not a remote, but a proximate cause of the accident. *Merrill* v. *North Yarmouth,* 78 Maine, 200, 57 Am. Rep. 794; *Higgins* v. *Boston,* 148 Mass. 484; *Davis* v. *Dudley,* 4 Allen, 557; *Titus* v. *Northbridge,* 97 Mass. 258, 93 Am. Dec. 91; Sherman & Redfield on Negligence, § 474; *P. W. & B. Railroad Co.* v. *Stinger,* 78 Pa. 219, 228; *Cleveland* v. *Bangor,* 77 Maine. 259; *Wardsworth* v. *Marshall,* 88 Maine, 263, 32 L. R. A. 588; *Dennett* v. *Wallington,* 15 Maine, 27; *Deville* v. *So. Pacific R. Co.,* 50 Cal. 383; *Murphy* v. *Deane,* 101 Mass. 455, 3 Am. Rep. 390. His want of due care was a proximate cause contributing to the result. *Neal* v. *Carolina Central R. Co.* (126, N. C. 634,), 49 L. R. A. 684; *Keefe* v. *Chicago & N. W. Ry. Co.,* 92 Iowa, 182, 54 Am. St. Rep. 542. Beach Contrib. Neg. § 35, c. IV. *Woodman* v. *Pitman,* 79 Maine, 456, 1 Am. St. Rep. 342, above cited. To hold otherwise would result in requiring the engineer to take better care of the man than the law required the man to take of himself as suggested in the last quotation. *Lucas* v. *New Bedford & Taunton R. R. Co.,* 6 Gray, 64, 66 Am. Dec. 406. Sometimes the conduct of the plaintiff justifies the action of the defendant at the time, even if it afterwards appears that he erred in judgment. *N. O. & N. E. Railroad Co.* v. *Jopes,* 142 U. S. 18; *Garland* v. *Maine Central Railroad Co.,* 85 Maine, 519.

A — FREIGHT HOUSE.
B — BAGGAGE ROOM.
C — PASSENGER STATION.

BOW ST.

SITTING: WISWELL, C. J., EMERY, WHITEHOUSE, STROUT, SAVAGE, POWERS, JJ.

WISWELL, C. J.    The defendant's passenger station building, at the Freeport station, is between its main line tracks on the south and its freight tracks on the north, and is about two hundred feet westerly of Bow street, a street running southerly from the village of Freeport, and which crosses the railroad tracks at about a right angle. A platform extends from the station building, along one of the main tracks, westerly nearly to Bow street.    Between the northerly side of this platform and the nearest freight track there is an open space extending from Bow street to the station building, nineteen and one-half feet wide at the street and thirty-two and one-half feet wide at the platform on the easterly side of the station building.    This open space is used as a passageway and driveway for persons having occasion to drive to the station, and the whole of the space is open and suitable for this purpose.    Access to this open space or driveway is had from Bow street, and also by driving over the freight tracks where there are plank-crossings, westerly of the street and nearer the eastern end of the station.

On the day of the accident, in the forenoon, the plaintiff's intestate drove along Bow street, southerly from the direction of Freeport village to the gate at the railroad crossing north of the freight track, in an open wagon with a barrel of potatoes in the wagon, back of the seat.    When he reached the crossing this gate was down, a freight train having previously arrived from Portland, which at that time and before had been upon the different freight tracks, the trainmen being engaged in shifting cars and making up the train to proceed easterly. Just previous to this, the locomotive had backed in westerly from the street towards the freight house west from the passenger station, and the gatekeeper raised the gates upon both sides of the crossing to allow the deceased to pass upon the highway.    The deceased drove across the freight track and then turned into the driveway to the station.    After driving to within about ten feet of the platform on the easterly side of the station building, he backed his wagon up to the platform extending along the main track towards Bow street, for

the evident purpose of unloading the barrel onto this platform.    His
horse's head therefore was towards the main freight track.    Before un-
loading his barrel, he went forward towards the freight track so that
he could look by the passenger station, undoubtedly for the purpose of
seeing where the freight train then was and what was being done
with it.    About this time the freight train started easterly on the
main freight track in the direction of Bow street, making the usual
noises caused by ringing the bell, the escape of steam, etc.    There-
upon, the plaintiff's horse became to some extent frightened, and the
deceased took hold of the horse's bridle and attempted to hold him.
There is some difference in the description by the eye-witnessess as to
the conduct of the horse and as to what extent he showed evidences
of fright; some of the witnesses, those for the defense, say that the
horse was all the time under control until the last plunge which
resulted fatally for the deceased, and this is undoubtedly true to the
extent that the deceased continued to keep his hold on the horse's
bridle and to remain upon his feet; but beyond this it appears from
the evidence that the horse had quite as much control over the man
as the man did over the horse.    He was moving about all of the
time.    As one witness expressed it, "the horse was in motion all the
time and was moving Mr. Ward [the deceased] first one way and
then the other by his head."    In further describing the scene, the
same witness said: "The horse once made a plunge with Mr. Ward
and came up so that once, as near as I could tell, his foot struck the
rail, and he made a surge and drew his horse back again."

As soon as the engineer in his cab got abreast of the easterly end
of the passenger station, and perhaps a little before that time, he
could, and did, see the condition, whatever it was ; he saw that there
was some trouble, and shut off the steam, so that after that the train
"drifted along", as he expressed it, without steam, and consequently
without the noise caused by the escape of the exhausted steam from
the cylinder, but the bell continued to be rung until just before the
collision.    The deceased's horse continued to show more or less signs
of fright, and to move about more or less violently, until finally he
made a plunge obliquely towards the track a few feet in front of the
locomotive and threw the deceased onto the track.    The engineer at

once reversed his engine and gave it steam, but this was too late and the deceased was run over by the locomotive and immediately killed.

Upon these facts, the plaintiff, claiming that her intestate's death was caused by the fault of the defendant, brought this action under chap. 124, Public Laws, 1891. The case comes to the law court upon the defendant's motion for a new trial, after a verdict for the plaintiff.

The questions for the determination of the jury at the trial were whether the danger to the plaintiff was so apparent to the engineer, while the latter was in sight of the deceased and his horse, that he was negligent in failing to take such measures as he might have to have prevented the accident; and whether the deceased was himself guilty of contributory negligence.

The defendant claims that the deceased was himself negligent in driving into this open space above described, and that this negligence was a proximate cause contributing to the injury, and that later, after the danger became more apparent to the deceased, he was negligent in not escaping therefrom by driving across the freight track over the crossings northerly of the east end of the station. That it was not necessarily an act of negligence upon the part of the deceased in driving up to the station platform, is apparent. This was the way provided for access to the station for those who had occasion to go there.

The deceased went there upon buisness connected with the railroad company, to leave the barrel of potatoes to be transported by the railroad company. He was therefore properly there, and was not a mere licensee upon the premises for his own convenience, *Plummer* v. *Dill*, 166 Mass. 426, although he may have been negligent in doing this, knowing that the freight train was in upon its track, if he also knew that his horse was usually frightened by trains, when in close proximity to them, to such an extent as to make it a hazardous thing for him to go there.

But, we do not think it necessary to decide this question, because even if it was a negligent act upon his part, we do not think that this negligence contributed directly as a proximate cause to the injury. It is too well settled in this state to permit of discussion, that whenever a plaintiff's want of ordinary care contributes as a proximate

cause to the injury for which he brings suit, he cannot recover. In such case the degree of his negligence, or the extent of its effect, as one of the causes for the injury is of no consequence. More than this, the burden is upon him to show affirmatively that no want of ordinary care upon his part contributed in the slightest degree to the injury of which he complained.

But, it is equally well settled that his mere negligence will not prevent a recovery, unless that negligence contributed to some extent, however slight, as a proximate cause for the injury. So that, although a plaintiff may have been negligent, and his negligence may have afforded an opportunity for the injury, if it precedes the injury, which is caused by a defendent's subsequent and independent negligence, then such negligence upon the part of a plaintiff will not prevent a recovery by him. It is not a question of degree of care or extent of negligence. It is not enough that a defendant might by the exercise of due care upon his part have avoided the consequences of the plaintiff's negligence, when that negligence is contemporaneous with the fault of the defendant. But if a plaintiff's negligence is so remote as not to be a proximate cause contributing to the injury, then a defendant's failure to exercise due care to avoid the consequences of the plaintiff's earlier and remote negligence, when by the exercise of such care, it could have been avoided, will render the defendant liable. This rule is firmly established in this state by a number of comparatively recent decisions, and we believe it to be a wise and salutory one when carefully and properly applied. *O'Brien* v. *McGlinchy*, 68 Maine, 557; *Pollard* v. *Maine Central Railroad Co.*, 87 Maine, 55; *Atwood* v. *Bangor, O. & O. Railway Co.*, 91 Maine, 399; *Conley* v. *Maine Central Railroad Co.*, 95 Maine, 149.

So that, even if the plaintiff's intestate was negligent under all of the circumstances of the case, in driving up to the station platform, when a freight train was upon the track, still a recovery may be had by the plaintiff, notwithstanding that negligence, if subsequently, the deceased being in danger by reason of the fright of his horse, and this danger being apparent to the defendant's engineer, the latter failed to exercise that care which the situation demanded. Nor can we say, after a verdict by the jury to the contrary, that it was negligence upon

the part of the deceased not to have attempted to cross the tracks over the crossings near the eastern end of the passenger station and thus avoided the danger. This would depend upon many conditions and circumstances. It might have been an imprudent thing for him to have attempted to cross at this place in front of an approaching train with a frightened horse.

The question, then, for the jury was, whether the engineer should have stopped his train, as it is admitted that he might have easily done, before the horse finally threw the deceased upon the track in front of the locomotive. This would of course depend entirely upon the conduct of the horse as the train was approaching, and upon what a reasonably prudent man in the position of the engineer would have been led to believe from what he saw. It has been argued with great force that there was nothing in what the engineer saw as to the fright of the horse to lead him to believe that there was any danger of such a serious character as to require him to reverse his engine and stop his train.

And if this question was to be decided by us it is not impossible that we might come to that conclusion. But, while this was the question submitted to the jury, the question presented for our determination is, whether or not the finding of the jury upon this question was so manifestly erroneous as to show that the jury, in finding for the plaintiff, was affected by sympathy, prejudice or some other improper motive. This was purely a question of fact. It is a question about which persons who have no other desire than to arrive at a true solution of the question, might reasonably differ. There is not so much difference in the testimony, although there is some, as there is as to the proper inferences that a jury would be authorized in drawing from the testimony, and especially as to what a reasonably careful and prudent man in that situation would have done. Upon the whole, although the case is not free from doubt and difficulty upon this question of fact, we do not feel disposed to say that the verdict upon this point was clearly and manifestly erroneous.

The defendant also claims that the amount of damages awarded by the jury was excessive. We think that this contention must be sustained, for this is a matter, under the evidence of this case, almost

entirely of mere computation.    The deceased was sixty-four years
of age.    For two or three years prior to his death he had no steady
employment, except that he worked upon his farm when he was not
engaged in doing chance jobs.    For some time he had not been
earning more than $150 a year over the cost of his own support, and
probably not so much as that.    The earning capacity of a laboring
man at the age of the deceased would continually diminish, while his
own living expenses would naturally somewhat increase.    While it
is the province of the jury to fix the amount of damages sustained by
those for whose benefit this action may be maintained, under the
statute, "with reference to the pecuniary injuries resulting to them
from such deaths," it is the duty of the court, if the amount awarded
is clearly excessive to set aside the verdict, or to fix a sum for an
amount beyond which the verdict may not stand.    This sum is not
necessarily what the court would award as the amount of damages,
but the maximum amount which is authorized by the evidence.    In
this case, we think that such maximum is the sum of $1250.

> *Motion sustained, unless the plaintiff, within thirty days*
> *after the rescript is received by the clerk, remits all*
> *of the verdict over $1250, as of the date of the verdict.*