## THE STEAM DREDGE NO. 1.

### (District Court, D. Maine. April 4, 1903.)

### No. 9.

1. DREDGE—NEGLIGENT HANDLING OF MACHINERY—LIABILITY FOR INJURY TO GOVERNMENT INSPECTOR.

A dredge employed in government work, under a contract requiring the presence of a government inspector on board at all times while the work was going on, is liable for an injury received by such inspector while on board in the performance of his duties and in the exercise of due care, through the negligent handling of her machinery by those in charge.

2. NEGLIGENCE—ACTION FOR INJURY—FAULT OF LIBELANT.

The negligence of a libelant in admiralty in placing himself in a position of some danger will not be held to constitute him in fault where the defendant was chargeable with notice of such negligence, and might by the exercise of reasonable care have avoided the consequences, and where the injury resulted from an act of negligence on the part of defendant, of which libelant had no knowledge and which he had no reason to anticipate.

3. SAME—EVIDENCE CONSIDERED.

Libelant, who was rightfully on a dredge as a government inspector of the work, was injured by the breaking of a bitt around which one of the lines used to move the dredge passed before reaching the winch head, such breaking being the result of the negligence of the man in charge of the winch head in failing to throw it out of gear after the dredge had been previously moved, or to see that it was out of gear when the signal was given to turn on the steam again, although he saw libelant sitting on or leaning against the bitt, the consequence being that the winch head was revolved before the dredge had been released from her fastenings, and the bitt gave way under the strain. *Held* that, although libelant was in a position of some danger, he had no reason to apprehend the negligence of the winchman, which was the proximate cause of the injury, and was not chargeable with fault.

In Admiralty. Action for personal injury.

Wm. H. Looney and Benj. Thompson, for libelant.
Bird & Bradley, for claimant.

HALE, District Judge. William Nelson brings his libel in this case against Steam Dredge No. 1, owned and operated by the Morris & Cummings Dredging Company, to recover for personal injuries sustained by him in Cape Porpoise Harbor, in the district of Maine,

on the 14th day of September, 1900. At the time of the injury the libelant was employed as inspector by the United States government on the defendant dredge. The dredge at that time was engaged in dredging Cape Porpoise Harbor under a contract which is in evidence. A book of instructions was furnished by the government's engineer to the inspector. These instructions are also in evidence. The libelant was a man of large experience on dredges and on other vessels. The dredge upon which the injury occurred is 96 feet and 8 inches in length, 35 feet beam, and 8 feet draught. In the performance of its work it was held in position by two spuds, each about 24 inches square, one upon the port, and the other upon the starboard, side of the dredge, near the bow. These spuds were fitted with pieces of cast iron at the lower ends where they went into the mud. They were about 55 feet in length, and very heavy. The dredge also had a stern spud in such position as to remain fast in the mud while the dredge was being moved, to prevent lateral motion. The dredge was fitted with two quarter lines, two breast lines, and one stern line; all these lines being of 5½ or 6 inch manilla rope. The quarter lines extended from 500 to 700 feet on each side, reaching some distance forward of the beam, and in fact at times forward of the dredge itself. The breast lines ran out nearly abeam. All these lines were made fast to anchors or some permanent object. When the dredge was in operation they were kept taut, so as to hold it in position while the work of excavating was in progress. The dredge was moved by means of these lines. Upon each side of the house, about half the distance fore and aft, were three gypsy heads, or winch heads, about 2½ to 3 feet in length, and about 18 to 24 inches in diameter. These winch heads were connected by shafting and gearing with an engine of about 40-horse power, which was used for raising the spuds and giving power to the winch heads, for the purpose of taking in the lines to move the dredge. Two of the gypsy heads on each side of the house were of the same height above the deck. The third was slightly higher from the deck, and nearly in the center between the other two heads. The forward winch head on either side of the house was used to secure the inboard end of the breast line, and the after head was used to secure the inboard end of the quarter line. On the port side the quarter line came in around a double cast iron bitt, secured to the deck by bolts through the bed plate. This line led forward from the bitt to the winch head. Whenever the engine was set in motion the center winch head would revolve; but before the winch head forward or aft could be operated from either side of the house it was necessary to put a clutch in gear, which would result in starting the winch head, whenever the man in charge of it should find it necessary in doing the work for which it was used. The steam to start the engine could be given from either side of the house. Under the rules of the dredge, the duty of giving steam was assigned to the mate. After the winch heads had been used, it was the duty of the man in charge of them to throw the clutch out of gear. If this was not done, and the clutch remained in gear, when steam was applied and the engine started the winch head which had been so left in gear would immediately start, and if there were suffi-

cient turns of the hawser about it a sudden tightening and taking in of the line must result.

While the dredge was doing its work it made cuts of 6 feet in length, requiring about 15 minutes to do the work of one cut. When the cut was completed it was the duty of the captain in the pilot house to make known his order to move the dredge by giving one blast on the steam whistle. The deck of the dredge and the machinery to make the moves were in charge of the mate, Charles Peterson, who on the day of the injury was stationed upon the starboard side of the dredge. It was his duty to give steam to the engine which raised the spuds and worked the gypsies. On the port side it was the duty of Otto Christensen to take charge of the work of raising the spud and superintending the lines. It was the duty of Casper Isaacson to look after the stern line. When the whistle was sounded for a move to be made, promptness and rapidity were required by all of the men in the prosecution of their work. It was the duty of the mate, Peterson, to go to the starboard side of the house, taking with him his assistant, Jack, and at once give steam to the engine for the purpose of raising the forward spuds. When these spuds had been raised it was the duty of the winchman, Christensen, upon the port side, to place the clutch upon the gypsy, which was thus set in motion for the purpose of taking in upon the quarter line. At the same time it was the duty of Isaacson to pay out six feet upon the stern line, so that the vessel could make its regular move of six feet. After the dredge had gone ahead the required six feet, she was breasted by the use of the breast lines, to keep her on the line of the cut which was then being made. After the move was accomplished the spuds were again dropped, and the work went on.

The work of dredging Cape Porpoise Harbor was done under a plan in evidence. This plan shows the different cuts and ranges on which the work was done. The contract which we have referred to provided that all work done under it, before being accepted, should be subject to a rigid inspection by the inspector appointed on the part of the government, and that such work as should not conform to the specifications in the contract should be rejected. It provided that the United States should appoint inspectors to see that the tide gauges, ranges, stakes, etc., were in proper order, and to enforce a strict compliance with the terms of the contract. The book of instructions, to which we have referred, required, among other things, that the inspector should be on board the dredge when the work began in the morning and remain during working hours; to see that the tide gauges and ranges were properly set and had not been disturbed; to take soundings at the stern of the dredge at every move, beginning amidships and making one every three feet on each side; to see that the dredge was properly aligned fore and aft; to sound over the side of the dredge, on the side of the finished cuts, to be sure that no ridges were left; and to locate the dredge at every move by the side ranges.

On the 14th day of September, 1900, the day of the injury, the libelant was aboard the dredge in the performance of his duties as government inspector. About 10 minutes after 4 o'clock in the afternoon

the dredge completed one of her cuts, and it became necessary to make a move. In accordance with the rules, the whistle was blown, and the mate, Peterson, ran to his place on the starboard side. The man Christensen proceeded to the port side, and Isaacson went to the stern line. The libelant for some minutes had been sitting or leaning upon or against the quarter bitt on the port side. How long he had been there is a matter about which the witnesses do not agree; he himself says some four or five minutes. There is other testimony that he had been there some minutes longer. He had been in conversation with two men, an assistant inspector by the name of Nolan and an electrician. Christensen, the man in charge upon the port side, testifies that he observed Mr. Nelson just prior to the accident, and thinks he was sitting on the bitt, and that two or three persons were near him; that these persons were another inspector, an electric engineer, and another man. He did not know whether they were talking or not. When the whistle sounded, the mate, Peterson, upon the starboard side gave steam to the engine for the purpose of raising the two forward spuds, without knowing that the after gypsy on the port side was then in gear. The evidence shows, however, that this gypsy was at that time in gear, so that it would revolve when the mate gave steam; and the spud not being up, and there being no possibility of the dredge making a forward movement, the quarter line would become suddenly taut, and something must give way. Christenson was on the port side, a few feet forward of the winch heads, looking after the port spud. Before the spud had been raised, and before the stern line had been slacked, the after winch head upon the port side began to revolve and take in upon the port quarter line, causing it to become very suddenly taut, and bringing so sharp a strain upon the port quarter bitt that the bitt broke, and threw Nelson 20 or 30 feet upon a coal scow, producing the injury for which this suit is brought.

In examining the rights of the parties in this case, it is necessary for the court to inquire, first, what duty, if any, the dredge and its management owed to the libelant, and whether, at the time of receiving his injury, the libelant was rightfully on the dredge. From the testimony in the case the court finds no difficulty in coming to the conclusion that the libelant was rightfully upon the dredge, with the knowledge of those in charge; that he was not there as a mere volunteer or licensee, but in the performance of his official duty. In this duty the dredge had an interest, for it could not proceed with its work without government inspection. The dredge then owed him the duty of prosecuting its work with reasonable skill, care, and prudence to provide for his safety.

In The Calista Hawes (D. C.) 14 Fed. 493, the libelant was an assistant United States weigher, whose duty it was to keep tally of the cargo of the ship, and to be about the hatch upon the main deck. The mate undertook to hoist a barrel from the pier to the vessel. The barrel swung across the deck, striking the libelant, and knocking him over the hatch combing, he having received no warning. Judge Benedict said:

"The libelant's injuries arose from the neglect on the part of the owner of the ship to discharge a duty arising on navigable waters out of the em-

ployment of the ship as an instrument of commerce, and owing to the libelant. The mate was in charge of the ship, and his neglect was in law the neglect of the owner. It was the duty of the mate so to hoist the barrel as to prevent it being pulled by the power of a horse across the deck where the libelant was standing. * * * He was standing where he had a right to stand in the discharge of his official duty. If he could be chargeable with knowledge that the barrel was being hoisted from the pier at that place, he had a right to assume that it would not be pulled across the deck where he was, and no notice to the contrary was given him."

In The City of Naples, 16 C. C. A. 421, 69 Fed. 794, a case in the Circuit Court of Appeals, the libelant was a deputy grain inspector of the state of Minnesota, and went upon the respondent's vessel to inspect it, as required by law, and while so engaged he fell through an open hatchway and was injured. The court said:

"The libelant was not on the vessel as a mere licensee. He was there in the discharge of an official duty, in which the vessel itself had an interest, for it could not receive its cargo until it had been inspected. The right and duty of the libelant to inspect the vessel did not authorize him to take command of her, or to give orders to her crew to prepare her for inspection, or light up the vessel for that purpose. It was the master's duty to prepare the vessel for inspection, to furnish what was necessary and proper for that purpose, and to exercise reasonable precaution for the safety of the libelant while in the discharge of his official duties. * * * The master of the vessel knew the libelant had come on board to discharge his official duty as inspector, and he knew what was necessary to enable him to discharge that duty efficiently and properly."

In Low v. Grand Trunk Ry. Co., 72 Me. 313, 24 Am. Rep. 331, the court of Maine has said:

"The owners of a wharf where foreign laden vessels discharge are liable to customs officers who are required to visit the premises in the performance of their duties, for personal injuries received while in the exercise of due care, because of the unsafe or unsuitable condition of the wharf. * * * The company owe a duty to all public officers whose attendance there is made necessary by the business carried on at their wharf."

A similar line of reasoning is adopted by Judge Benedict in The Kate Cann (D. C.) 2 Fed. 246.

While the contract and instructions in the case at bar make it incumbent upon the libelant as inspector to see that proper appliances are used upon the dredge, they do not put upon him the duty of managing the dredge, or the responsibility of seeing that her machinery is handled and her seamanship conducted safely and properly. Those duties were incumbent upon the master and crew of the dredge, and were prompted by the care which the law has for the safety of persons and property on board.

So far, then, the court has no difficulty in coming to the conclusion as to the duty of the dredge and her management to provide reasonably for the safety of the libelant while he was on board the vessel in the performance of his duties as government inspector. The court finds, too, under the settled law of the federal courts, that the admiralty has jurisdiction of the dredge, and that the libelant may properly proceed by libel in rem to assert whatever rights he may have in the premises.

The court now comes to a question of very grave importance and of some difficulty. Was the injury to the libelant due to the negli-

gence of those in charge of the dredge, or was it due, in whole or in part, to his own negligence? The libelant testifies that he was keeping a record of the time of each move of the dredge and a record of all the work; that in pursuance of his instructions he saw that the dredge was kept in proper alignment fore and aft, and that he located it at every move; that when the whistle blew he customarily went to the point on the dredge where the location lines or ranges intersected, and remained there until the dredge had made her regular move; that after she had made her move he went and took soundings and recorded them, and always located the dredge by the side ranges, having no other means of doing so; and this he did every time the dredge moved. In performing these duties, particularly in getting the side ranges, the libelant was properly upon the port side of the dredge. The testimony shows that certain ranges intersected at substantially the point where the inspector was at the time of the injury. He was then at the point on the port side where his duties required him to be.

But, as we have already said, the testimony shows that he was sitting or leaning upon the port bitt, and must have been within the bight of the hawser which constituted the quarter line, and was connected with the gypsy head and passed around the bitt. In sitting or leaning upon an object within the bight of a rope, whether he had been warned or not, the libelant assumed a position of some danger. As a reasonable man, he must have known that in placing himself in such a position he took some chances. He must be charged, then, with knowledge of the ordinary risk incident to sitting in a position within the bight of a rope. But it must be remembered that he did not know that the clutch was upon the gear, and that the hawser would be subjected to the great strain to which it was exposed by the clutch being upon the gear at an improper time. This was a risk of which he had no knowledge, and which he cannot in law be held in any way to have assumed. Did, then, the injury come from an act of negligence of the libelant?

This brings us to the question of just what was the actual cause of the injury. It appears from the testimony in the case that it was the duty of Christensen upon the port side, when he got through with the use of the winch head, after a move had been made, to throw the gypsy out of gear. Christensen had charge of that side of the dredge and of the lines on that side of the dredge. From the testimony in the case the court finds that it was Christensen's duty not only to throw the gypsy out of gear, but to see that the gypsy was kept out of gear, so that when the whistle sounded, and steam was applied, and the spud raised, he should be sure that at the same time the gypsy was not in gear, for he knew that when it was in gear the quarter line would suddenly and with great force be brought up taut, and, the dredge not being able to go forward, something must give way. It was the duty of the dredge, in properly providing for the safety of the persons and property on board of her, to see that when steam was given to the engine the spuds should be raised before the gearing was applied setting the gypsy heads in motion. The management of the dredge had committed this duty on the port side to

Christensen. If he had properly attended to that duty, he would have thrown the gypsy out of gear after the last move, and he would have seen to it that the winch head was kept out of gear until the spud was raised and the dredge could be moved forward. He would have seen, when the whistle sounded, that the after gypsy was still in gear, and that the giving of steam to the engine could not fail to start the gypsy and take in the quarter line on the port side, necessarily endangering the persons and property near the point where the libelant was. The preponderance of the evidence convinces the court that Christensen saw Nelson just before or at the time the whistle sounded. He therefore knew that the libelant was in a dangerous position, and even then it was his duty, either to see that the libelant moved from that position of danger, or to see that the gypsy was at once thrown out of gear, so as to avoid the great peril in which the libelant was placed. For although the libelant had placed himself in a position of some peril which he knew, namely by being within the bight of a rope, the great peril was a peril which he did not know. That peril resulted from the fact that the gypsy head was in gear, so that when steam was given to the engine great danger would ensue to any one in that vicinity.

The principle that the party who has the last opportunity of avoiding the accident is not excused by the negligence of any one else has now become settled law. It is a familiar rule that where the plaintiff's negligence is so communicated by knowledge that by the exercise of ordinary care and skill the defendant might have avoided the injury the plaintiff's negligence cannot be set up in defense of the action. The leading case upon it is Davies v. Mann, 10 M. & W. 547. Parke, B., announced the rule of the court that "the negligence which is to preclude a plaintiff from recovery in an action must be such as that he could by ordinary care have avoided the consequences of the defendant's negligence."

The federal courts have followed in the line of this leading English case. In Gilbert v. Erie Railroad, 38 C. C. A. 408, 97 Fed. 747, the court quoted from a celebrated text-writer:

"It is not necessary that the defendant should actually know of the danger to which the plaintiff was exposed. It is enough if, having sufficient notice to put a prudent man on the alert, he does not take such precautions as a prudent man should have taken under similar circumstances."

In Grand Trunk Railway Co. v. Ives, 144 U. S. 408, 12 Sup. Ct. 679, 36 L. Ed. 485, the court said:

"Although the defendant's negligence may have been the primary cause of the injury complained of, yet an action for such an injury cannot be maintained if the proximate and immediate cause of the injury can be traced to the want of ordinary care and caution in the person injured, subject to this qualification: * * * That the contributory negligence of the party injured will not defeat the action if it be shown that the defendant might, by the exercise of reasonable care and prudence, have avoided the consequences of the injured party's negligence."

In the Inland & Seaboard Coasting Co. v. Tolson, 139 U. S. 551, 11 Sup. Ct. 653, 35 L. Ed. 270, Mr. Justice Gray, of the Supreme Court, states the rule substantially as laid down in Grand Trunk Ry. v. Ives.

B. & O. R. R. Co. v. Hellenthal, 31 C. C. A. 414, 88 Fed. 119, affirms this rule.

In Washington & Georgetown R. R. Co. v. Harmon's Adm'r, 147 U. S. 582, 13 Sup. Ct. 560, 37 L. Ed. 284, Chief Justice Fuller comments very clearly upon this principle. He said:

"If the conductor negligently failed to observe whether the plaintiff had alighted, or, knowing that he had not alighted, he started the car too soon, and in consequence of that a sudden jerk of the car took place, and threw him down, and was the immediate cause of his falling, and the accident would not have happened but for that fact, we think it clear that such negligence as might be imputed to the plaintiff in being upon the step at all could not, under the circumstances supposed, be properly held to have been contributory negligence.  *  *  *  It may be said that he placed himself where he was in the risk of falling off, but that was a risk he could not have anticipated as the result of a sudden start before he got off."

The law of the case on this subject has never been more clearly stated than by Judge Taft in the Louisville & N. R. R. Co. v. East Tennessee, V. & G. R. R. Co., 9 C. C. A. 317, 60 Fed. 996. Judge Taft says:

"If, with the knowledge of what the plaintiff has done or is about to do, the defendant can, by ordinary care, avoid the injury likely to result therefrom, and does not, the defendant's failure to avoid the injury is the last link in the chain of causes, and is in law the sole proximate cause."

The courts of Maine have passed very fully upon this question. In Ward v. Railroad Co., 96 Me. 144, 51 Atl. 949, the court said:

"The plaintiff's intestate went upon the premises in connection with the business of the company.  *  *  *  He was properly there, and not a mere licensee upon the premises for his own convenience, and, even although he might have been negligent, if his negligence did not contribute directly as a proximate cause to the injury it does not prevent his recovering, unless it contributed to some extent as a proximate cause for the injury. So that although a plaintiff may have been negligent, and his negligence may have afforded an opportunity for the injury, if it precedes the injury, which is caused by a defendant's subsequent and independent negligence, then such negligence upon the part of a plaintiff will not prevent a recovery by him."

In Fickett v. Fibre Co., 91 Me. 268, 39 Atl. 996, it was held:

"In an action brought by the servant against the master, if the plaintiff knew and appreciated the danger which was the cause of the injury then he may be held to have voluntarily assumed the risk. But mere notice that there was some danger, without appreciating the risk, will not, of itself, preclude the plaintiff from recovering."

In Conley v. Maine Central Railroad, 95 Me. 149, 49 Atl. 668, the court said:

"However negligent he [plaintiff] may have been in getting into the path of the ferry boat, still such negligence was not the proximate cause of the injury; that the negligence of Conley preceded and was independent of the negligence of the defendant; and that, notwithstanding Conley's negligence, the collision could have been avoided by the use of ordinary care and caution at the time by the defendant; and hence that Conley's conduct did not contribute to produce the collision. If Conley and the Hercules were respectively where the plaintiff's witnesses say they were, at the time the alarm whistle was sounded, the Hercules approaching Conley, and Conley apparently unable to make headway against the tide and to get out of the path of the Hercules, the defendant was bound to exercise due care to prevent a collision."

See, also, Atwood v. Railroad Co., 91 Me. 399, 40 Atl. 67; Pollard v. Railroad Co., 87 Me. 51, 32 Atl. 735; O'Brien v. McGlinchy, 68 Me. 552.

In the federal courts contributory negligence is a defense. The burden of proof is upon the defendant. Reasonable presumptions and inferences in respect to matters not proven or left in doubt should be in favor of the injured party. Wabash Railroad Co. v. Central Trust Co. (C. C.) 23 Fed. 738.

The cases which we have cited seem to us to decide principles which are vital in the case at bar. They are principles drawn from the courts of common law. It is true that courts of admiralty have much greater powers than courts of common law in dividing the damages, and in fixing these damages in accordance with the fault or negligence which is properly to be charged to either party. The principles drawn from the cases above cited seem to us, however, to be entirely applicable to the admiralty side of the court and decisive of this case.

We think that the libelant is not chargeable with fault in failing to avoid the consequences of the defendant's negligence. It was not his duty to take charge of the gypsy heads. He knew nothing of their management, and he was not bound so to know. He was not charged with the duty of going to the gearing and seeing if it was in a proper position when the whistle sounded, but Christensen was charged with this duty. It is true that the libelant was guilty of some negligence in sitting within the bight of a hawser. But, as bearing upon the measure of this negligence, it may properly be said that those who saw him there, and had no further information than he did as to the condition of the clutch and gear, did not think his negligence was of sufficient account to demand any warning upon their part. The injury could have been avoided if, after his position was known to the management of the dredge, and particularly to Christensen, the gypsy head had been thrown out of gear; for it was the duty of Christensen, when he found that the libelant was in a dangerous position, to see to it that the great danger was avoided by throwing the gypsy head out of gear. Even though he had left it in gear after the last move, and allowed it to remain in gear up to the time of seeing the plaintiff on the bitt, still at that time he could have avoided the injury by throwing it out of gear. The evidence convinces the court that Christensen had either carelessly left the clutch in gear, or had neglected to seasonably see that it was thrown out of gear. Having been guilty of one of these two faults, he could still have avoided the injury when the whistle sounded by giving the libelant warning, or even by then throwing the gypsy out of gear. So that the primary fault and the final fault was with Christensen.

Although the libelant placed himself in a position of some danger, he clearly did not appreciate the great danger he was actually in, for he did not know it, and did not have reason to know it. Under the doctrine of the cases which we have cited, while he is charged with notice of some danger, he did not appreciate the risk he was taking, for he did not know the danger he was actually assuming. It was not the case of two contemporaneous negligences, for the negligence of the defendant was continued after the negligence of the

libelant. The final negligence of the defendant in not throwing the winch head out of gear when or just before the whistle sounded was sufficient to produce the injury. If the ordinary precautions, which the libelant had a right to expect, had been observed by those in charge of the dredge, particularly by Christensen, there would have been no injury. It cannot be contended that the ordinary use of the lines, passing over the gypsy head and around the bitt, in a proper management of the dredge, would have broken the bitt; but the heavy strain being placed upon the lines, the spuds not being up, disaster must and did follow.

The court finds that the injury was due to the negligence of the dredge and those in charge of it. There must, therefore, be a decree in favor of the libelant, with an order of reference to ascertain the amount of the damages.