## STEWART v. ATLANTIC GULF & PACIFIC CO.

### No. 3874.

District Court, S. D. Florida,
Jacksonville Division.

Dec. 28, 1934.

Cockrell & Cockrell, of Jacksonville, Fla., and Reese, Scarlett, Bennet & Highsmith, of Brunswick, Ga., for libelant.

Noble & Blondheim, Reuben Ragland, and E. J. L'Engle, all of Jacksonville, Fla., for respondent.

STRUM, District Judge.

On June 29, 1931, and theretofore, the dredge Norfolk, operated by respondent, was engaged in dredging operations in Bruns-

wick Harbor, Ga., under contract with the War Department of the United States, the work being done under the supervision of the Engineers' Corps.

The contract provided that all workmanship and material was subject to inspection by government inspectors. Respondent was required to furnish all reasonable facilities necessary for safe and convenient inspection and test of the work, as might be required by the inspectors furnished by the government, including boats and boatmen as necessary for inspecting the work, and suitable transportation from all points, and that respondent should be responsible for all damages to persons or property that occurred as a result of respondent's failure or negligence in connection with the prosecution of the work.

Libelant, Stacy A. Stewart, was an inspector employed and designated by the government stationed on said dredge, and was acting for the government as an inspector pursuant to the provisions of said contract, his duties being to check and inspect the work as it progressed to see that the contract and specifications were complied with. Libelant was not a civil engineer, but was an inspector or survey man in the Engineer Department.

On June 29, 1931, libelant, in the course of his duty, left the dredge for the purpose of locating and taking soundings over a rock shoal at a point which had been dredged under the contract, and at which it was anticipated further dredging would be necessary. Before leaving the dredge, libelant notified the lever man, who was directly in charge of the operating machinery of the dredge, of his intention to go out and locate the shoal. Libelant was also in plain view of the persons on the forward part of the dredge, and could be seen from the lever room, where the lever man was stationed. Libelant left the dredge in a small flat-bottomed skiff or rowboat, about 14 feet long, which was operated by a member of the crew of the dredge known as a clerk, both furnished by respondent for that purpose. The rowboat proceeded to the supposed location of the shoal, and libelant commenced to take soundings with a lead line, drifting back with the tide along established range lines toward the dredge. To take the soundings libelant stood up in the stern of the row boat, and was thus taking soundings with the lead line as the rowboat approached the dredge. When about 20 or 30 feet away from the dredge, the lead line fouled on the swinging cables of the dredge as the lead line was being wound in by libelant, but the line was cleared and

other soundings taken after passing the swinging cables at that point, which was somewhat forward of the dredge. The clerk who was rowing the skiff brought it alongside the port side of the dredge toward the bow of the dredge and threw the painter, about 13 feet long, secured to the bow of the skiff, over a cleat secured to the main deck of the dredge near the bow, and himself climbed aboard the dredge. The main deck of the dredge is about 3½ feet above the water line. Libelant was still standing in the stern of the skiff winding up the lead line. In that position he was plainly visible to the lever man when the lever man stood in a position to start the swinging machinery of the dredge, but probably would not be visible to the lever man when the latter left that station and proceeded to the rear of the lever house to start the digging machinery. Libelant was also visible to members of the crew about the deck, particularly on the fore part of the dredge.

While libelant was still standing in the stern of the rowboat winding in the lead line, and without notice of any kind, the lever man started the swinging machinery of the dredge so that the dredge was swung to port, striking the skiff a substantial "bump," throwing libelant off his balance. In trying to prevent himself from falling, libelant instinctively threw his arms out to catch some solid object with which to steady himself. He grasped a steel cable, one of the swinging cables of the dredge, attached at its outboard end to an anchor and on its inboard end to winding drums on the dredge. As the lever man had already put the swinging machinery in operation causing the drums to revolve, this port swinging cable was being drawn inboard through a metal sheave or pulley which turns in a metal bracket. When libelant grasped the steel cable to check his fall, the movement of the cable carried his right hand into the metal sheave and severely mangled and crushed the fingers of his right hand. The outer joint of his index finger was practically destroyed, and the second joint severely mangled, and the entire finger is now stiff and points back away from the thumb. The first and second joints of the second and third fingers were completely destroyed, leaving only two short stubs of the inner joints. The nubs of these two fingers are now hypersensitive after healing. The little finger is intact, but stiff, and its movement impaired. The thumb was not substantially impaired.

These injuries are, of course, permanent, and resulted in a 60 per cent. impairment in libelant's earning capacity. As a result

346

of the injury he suffered excruciating pain and agony for several days, and very substantial pain for a long period of time thereafter. At the time of his injury libelant was earning $150 a month in addition to his board and lodging on the dredge. After the injury, when his hand was healed, libelant first secured employment in a similar occupation at $150 a month, but was soon reduced to $125, then to $110, and then discharged. Libelant testified that he was discharged because he could not perform his duties satisfactorily on account of his impediment.

When libelant left the dredge to make the soundings, and when he approached alongside the dredge on his return, the dredge was not in motion. It was the custom for libelant, after making soundings of this character, to further check the location of the shoal by sextant angles taken from the bridge of the dredge, and it was the usual practice not to move the dredge until the sextant angle had been taken. Libelant was, therefore, justified in believing that the dredge would not be moved to resume the dredging until after he had left the skiff.

The lever man who set the swinging machinery in operation and caused libelant's injuries denied that he saw libelant alongside the dredge before he started the machinery. Disregarding, however, for the moment, the libelant's specific testimony that he notified the lever man when he was leaving the dredge, and taking the testimony of the other witnesses as a whole, it seems inevitable that this lever man knew of libelant's mission. Even if it be the case that he did not actually know that libelant was again alongside the dredge, if he had simply glanced out of the window of the lever room, where he was standing when he started the swinging machinery, he would have inevitably seen libelant standing in the skiff alongside the port side of the dredge near the bow.

The operation of swinging a powerful and ponderous dredge, such as this, is a dangerous one. Ordinary care required that the lever man, or some other operative, ascertain that the port side was clear before swinging the dredge in that direction, as a natural consequence of the movement would be to strike any other craft on the port side of the dredge, and, in the case of the libelant standing in the small skiff, to cause him to lose his balance. The slightest forethought on the part of the lever man, and the ordinary exercise of his faculties, would have disclosed libelant's position of peril, but such precaution was apparently omitted.

Libelant was twenty-five years of age on December 29, 1930, six months prior to his injury, and was then in normal health and physical condition. He had a life expectancy of 37.75 years.

By virtue of his employment and performance of the work in which he was engaged at the time of his injury, libelant was an invitee in and about the dredge and as such invitee respondent owed the libelant the duty to exercise ordinary care for his safety. The following cases are apposite in principle: Steam Dredge No. 1 (D. C.) 122 F. 679; The Calista Hawes (D. C.) 14 F. 493; The Lisnacrieve (D. C.) 87 F. 570; The Anaces (C. C. A.) 93 F. 240; Paauhau Sugar Plantation Co. v. Palapala (C. C. A.) 127 F. 920; The Joseph B. Thomas (C. C. A.) 86 F. 658, 46 L. R. A. 58; The Kate Cann (D. C.) 2 F. 241, affirmed (C. C.) 8 F. 719.

The respondent is guilty of negligence in swinging the dredge to port without first ascertaining that the port side was clear, and without notice to libelant, so that it struck the skiff in which libelant was standing, when the lever man knew, or by the exercise of reasonable diligence could have known, of libelant's position of peril. Such negligence was the proximate cause of libelant's injury.

Libelant is not guilty of contributory negligence. It is not unusual, nor a lack of ordinary prudence, to stand up in a skiff while winding in a sounding line in the circumstances in which libelant was situated. While libelant's standing posture may have rendered him more vulnerable to injury, it did not proximately contribute to the negligence which caused his injury. It was the act of respondent in swinging the dredge without notice, and not libelant's standing posture, which caused the injury. Libelant would have been perfectly secure in his standing position, had not the lever man started the dredge without notice and struck the skiff in which libelant was standing. After having been violently toppled off his balance, it was but instinctive that libelant grasp the first solid object in reach, which unfortunately was the inboard moving swinging cable, negligently set in motion by the respondent. This situation is not comparable to that of a pedestrian who walks out into a public street, or upon a railroad track, where traffic is to be reasonably anticipated. Libelant is not charged with the duty of anticipating that the lever man, contrary to the usual custom, would swing the dredge without notice

and before libelant had checked the location of the shoal from the bridge. On the contrary, libelant was entitled to assume that the lever man, knowing, or with the adequate means of knowing, of libelant's exposed position, would not swing the dredge toward libelant without first notifying him. The doctrine that, where two methods or means of performing an act are provided—one safe, the other dangerous—the choice of the dangerous method or means is at the peril of the person making the choice, is not controlling here. That doctrine is usually applied in actions between master and servant. Here the libelant is not the servant or employee of the respondent, but is an invitee. Only one method or means of making soundings was provided for the libelant. Even if the libelant's act in standing instead of sitting in the skiff while he wound in the lead line constitutes a choice of method or means, and if the doctrine last mentioned is applicable to an invitee, it is not controlling in this instance, because the method chosen by libelant of standing in the stern of the skiff while winding in the lead line was not per se dangerous. It was made so only by the active negligence of respondent in swinging the dredge without warning against the skiff.

 Damages: At the time of his injury, libelant was 25½ years old. His earning capacity was $1,800 per annum. He is 60 per cent. disabled. Libelant has, therefore, been deprived of the equivalent of a life estate worth $1,080 per annum over the period of his life expectancy. According to Carlisle's Table of Mortality found in volume 5, Compiled General Laws of Florida (1927), at page 4212, the present value of a life estate at age 25½, on a six per cent. basis, is to be ascertained by multiplying the value of the estate per annum by 13.321, this multiplier being the mean between 13.456, at age 25, and 13.368, at age 26. $1,080 multiplied by 13.321 equals $14,386.68, which represents libelant's damages for impairment of earning capacity. Of course, 6 per cent. per annum on the last-named sum is less than $1,080. But libelant is not presently entitled to a sum which invested at 6 per cent. will produce an income equal to his annual loss, and still have the principal sum intact at the end of his life expectancy. There must be a proportionate annual diminution of the principal, so that the principal will also be expended over the life expectancy. Six per cent. per annum on $14,386.68 produces $836.20 per annum. $14,386.68 divided by 37.75, libelant's life expectancy, produces $381 per annum. These two sums added

equal $1,244.20, which exceeds libelant's annual loss of $1,080. The difference between $1,244.20 and $1,080 per annum is accounted for by the ratio of reduction in interest due to the annual diminution of principal, so that, over the entire period of libelant's expectancy, the income value of the sum of $14,386.68 would be approximately $1,080 per annum.

To the above sum of $14,386.68 should be added the further sum of $500 for pain and suffering, past and future, and for permanent disfigurement, so that libelant is entitled to recover from respondent the sum of $14,886.68, with interest from this date.

A decree in accordance with these findings may be prepared by counsel, and settled on notice.