GORHAM v. CUNARD S. S. CO., Limited.

(District Court, D. Maine.    October 17, 1918.)

No. 478.

1. SHIPPING ☞84(3)—LIABILITY OF SHIP—INJURY TO STEVEDORE.

A steamship company *held* liable for injury to an employé of contracting stevedores for coaling a ship, on the ground that its walking boss, co-operating in the loading as on former occasions in the course of his employment, furnished an unsafe rigging for use in delivering the coal at the hatchway.

2. CORPORATIONS ☞423—LIABILITY FOR NEGLIGENCE OF AGENT.

A corporation may be held liable for negligence of its agents, where the act in question was performed in the course of the agent's employment in the business of the principal.

In Admiralty.    Suit by Patrick F. Gorham against the Cunard Steamship Company, Limited.    Decree for libelant.

Woodman & Whitehouse and Raymond S. Oakes, all of Portland, Me., for libelant.

Bradley & Linnell, of Portland, Me., for respondent.

HALE, District Judge.    The libelant brings this suit for personal injuries alleged to have been received by him on January 4, 1918, while engaged as a stevedore in the service of Randall & McAllister, coal dealers, in loading bunker coal into the respondent's steamer Ascania, while lying at the dock alongside the Grand Trunk wharf in Portland Harbor.    He says that his duties required him to guide heavy tubs of coal from the side of the ship to the hatchway; that the respondent was under the duty of exercising reasonable care in providing a safe place for him to work, and that this included the duty of seeing that any rigging or machinery which it undertook to provide should be reasonably safe; that the respondent failed in this duty; that by its walking boss, Covell, it put up a rigging which proved unsafe; and that thereby a block became unhooked from a guy wire, and was thrown, with violence, against libelant's head, causing injury.

The respondent denies that it was its duty to provide appliances to carry on the work of coaling, or that its agent constructed any temporary device for the purpose of dragging buckets of coal from the side of the ship to the hatchway, and says that this device was constructed by Randall & McAllister, under the direction of their foreman; that it gave no invitation for the libelant to render service on the ship, or to come upon the ship for any purpose; that it contracted with the libelant's employers, Randall & McAllister, to coal the ship,

and did not undertake to provide any rigging for the purpose; that whatever Covell did in supplying the rigging was voluntary, and in the nature of a loan; and that it was not the act of the company.

The proofs show that the Ascania was to be supplied with coal for her bunkers, under a verbal contract between the respondent company and Randall & McAllister. Gorham was in the temporary employment of Randall & McAllister, and was acting as one of the stevedores in loading coal upon the ship. By reason of the construction of the vessel, and its height out of water, it was found impossible to load the coal with the usual appliances which Randall & McAllister had; the derrick on the lighter used by Randall & McAllister would not reach far enough on board to land the tubs of coal conveniently for dumping through the small center hatch on the ship. Covell, the head walking boss of the respondent company, obtained from the respondent company's shed a special rigging suitable for the required use, a rigging which the company had provided before in such cases. A so-called Warren lighter, having a tall derrick mast and heavy buckets, was brought alongside. It appears that Covell had rigged this vessel and other vessels in the same manner, and knew how to do it. The rigging consisted generally of a span leading from one of the funnels on the vessel to the deck; this span wire was extended from the smokestack, and carried forward to a ventilator across the hatch, lengthwise of the vessel; a block, called a Boston block, with an open hook, was placed on the span wire and hung over the hatch; the open hook of this Boston block had no shackle bolt to close its opening; a guy wire was attached to the block, and carried backwards to a point near the funnel, to hold the block from sliding down the slanting wire toward the ventilator; a cross guy wire was affixed to the slanting wire, and carried back to a point on the opposite side of the ship, to prevent the slanting wire from swinging too far toward the side of the vessel over which the coal came in; in order to hold the block on the wire, a mousing, or lashing, was wound around the neck of the hook; a rope attached to, and running from, the drum end, on the steam winch, forward near the ventilator, was passed through the block, and attached to a tub on the side of the vessel nearest the lighter. The pull from the tub on the slanting wire was at about right angles; and the pull from the rope to the steam winch drum was between the right angle and the direct line of the slanting wire, something less than a right angle. The tubs to which the rope was thus attached were dragged by this line, passing through the block, and by the turn of the steam winch, along the deck, and were dumped into the hatch. In the passageway of the tubs across the deck were two lifeboat stanchions, about 15 feet apart, with a rest in the center, between them, about 18 inches above the deck; this center rest tended to obstruct the tubs. Gorham was engaged in attempting to pull the tubs by the obstruction, and the tubs were found so heavy that it was necessary for the winchman to turn his drum in order to swing and surge the tubs, and thus lift them by the obstruction. This surging and rapid movement of the tubs caused the block to be brought back sharply against the span wire; in this way the mousing, or lashing, on the hook

was chafed, so that the hook jumped off the span wire, and the block was thrown with force against the libelant's head.

The evidence shows that, when Randall & McAllister's crew came on board the Ascania on the morning of the injury, for the purpose of coaling the ship, their foreman, Mulkern, knew that the ship had to be loaded, no matter what was her position; it was evidence that she stood too high in the water for their trucks to swing the buckets over the hatch, and that a special rigging would have to be put up; the walking boss of the respondent was then consulted; Covell sent at once to the Cunard shed to get the rigging, and helped to put it up; he co-operated with Mulkern and instructed him; he had, before that, supervised the loading and unloading of the same vessel, and had superintended the putting in of coal by his own crew and others from the upper deck when the ship was light; he had used the extra hoist in the same way he was then using it; he knew he would have to use the same rigging as before, so that, when the coal and the men came, he was there, expecting to assist and to supply the rigging.

[1] I cannot sustain the contention of the respondent that, in furnishing the rigging and putting it up, Covell was acting only as a volunteer, and was merely loaning the rigging to the coal dealers. It was clear that the character of the ship and its position high out of the water required a special rigging; Randall & McAllister were not obliged by their contract to furnish it. When confronted with this situation, the walking boss of the ship furnished the rigging, and directed its erection and use. The testimony leads me to the conclusion that he was acting in the general course of his duties, and in furtherance of the business of the ship; those intrusted with the conduct of the ship must be bound by his action. Even though the ship was under no contractual obligation in the premises, it was under the duty of seeing that the instrumentalities, furnished by its walking boss, and superintended by him, under the circumstances shown by the proofs, were reasonably safe for the purpose for which they were intended. It is shown, too, that Covell stayed around the ship and saw the operation of the rigging, and that he had knowledge of the mousing on the hook; he knew that, when the hook repeatedly swung back, bringing the mousing against the span, this action would tend to wear off the mousing, and to cause the consequent fall of the block. It is in testimony, too, that after the injury he furnished a block not having an open hook, but provided with a shackle, because, as he says, "we thought it was safer." The evidence is convincing that he was a man of experience in his work; that he was acting in the course of the business of the ship; that he selected the special rigging and superintended its installing; that he saw it in operation with the heavy tubs; that he knew the difficulties and liability to injury resulting from its use. If he had stopped the work as soon as he perceived the danger, and had then procured from his shed a shackle block with an iron bolt, which could not have chafed, the injury would not have occurred. The libelant was engaged in performing a service in which the ship had an interest; those in charge of the ship were under the duty of exercising the care of a reasonably prudent man in providing a safe place for him to

work; this must be held to include the duty of seeing that any instrumentalities which it undertook to provide should be reasonably safe. It is the duty of an employer, inviting workmen to use his structures, to exercise reasonable care and diligence to make them fit for use. The Rheola (C. C.) 19 Fed. 926; Pioneer S. S. Co. v. McCann, 170 Fed. 873, 96 C. C. A. 49; Hough v. Railway Co., 100 U. S. 214, 220, 25 L. Ed. 612.

I am constrained by the testimony to hold that the rigging was actually furnished by the ship, even though the ship was under no contract to provide such a structure. The action of Covell, the walking boss, was clearly an act of co-operation on the part of the ship in the work of loading the coal. In The Lisnacrieve (D. C.) 87 Fed. 570, 572, Judge Thomas, of the Eastern District of New York, held that, where the owners of a ship furnished a winchman to assist in unloading, they were liable to an employé of the stevedore, who was unloading the ship under a contract, for injuries caused by the negligence of the winchman, although they were under no contractual obligation to furnish the winchman, and although the winchman was working under the orders of the stevedore; that such an undertaking was not merely loaning a servant to a stevedore; it was co-operation on the part of the ship in the work of unloading the cargo.

In the case at bar, the walking boss of the respondent was clearly co-operating in the work of loading the coal, although he was under no contractual obligation to so co-operate. In so doing, it is clear that he was acting in furtherance of the business of his principal; that he was put forward by it as the man in general charge, in the course of the ship's business, of all matters pertaining to loading it and fitting it for sea. Under these circumstances, the respondent must be held to be bound by the action of Covell. I am satisfied, too, by the evidence, that the liability to injury from the use of the rigging in question could have been discovered by the exercise of the degree of care required under all the circumstances of the case, and that therefore the shipowner must be held to be liable for the libelant's injuries. In this respect The Bolton Castle, 250 Fed. 403, —— C. C. A. ——, is in point; that case was lately decided by the Court of Appeals in this Circuit, in an opinion sent down in April last.

[2] The law of the federal courts is clear that, in order to hold a corporation liable for the negligence of its agents, the act in question must be performed in the course of the agent's employment in the business of the principal. There must be evidence of some facts from which the authority of the agent to act upon the subject-matter involved may be fairly and legitimately inferred by the court; and this rule is applicable to the case of a corporation as in the case of an individual. Salt Lake City v. Hollister, 118 U. S. 256, 6 Sup. Ct. 1055, 30 L. Ed. 176; Lake Shore, etc., Ry. Co. v. Prentice, 147 U. S. 101, 109, 13 Sup. Ct. 261, 37 L. Ed. 97; Washington Gaslight Co. v. Lansden, 172 U. S. 534, 544, 19 Sup. Ct. 296, 43 L. Ed. 543.

Such evidence as is referred to in the above cases is found in the case before me. I can have no doubt, from this evidence, that the respondent was bound by the act of its walking boss in co-operating

with the employers of the libelant in loading the coal upon the ship, and in furnishing a rigging for that purpose. If Covell, who must be held to have been the agent of the respondent in the premises, had exercised the caution of a reasonably prudent man, as soon as he found that injury might result from the operation of' his rigging, and had provided the shackle block with an iron bolt, as he did after the injury, the accident would not have occurred. I am satisfied that his negligence was the negligence of the ship, and was the primary cause of the injury.

No fault of the libelant is alleged by the answer or shown by the proofs.

The respondent must therefore be held to have been solely at fault.

Pursuant to this opinion, a decree should be rendered for the libelant in an amount that shall fairly compensate him for his injury. He lost his wages for 10 weeks; he suffered something from the reduction of his pay after he returned to work; he paid his medical expenses; he suffered some pain. A careful examination of the evidence leads me to the conclusion that the sum of $900 will be reasonably compensatory to the libelant. Let a decree, therefore, be entered for that sum, with costs.