## PLECKAITIS v. HENRIK OSTERVOLZE DOCKING CO. et al.

(Circuit Court of Appeals, Second Circuit. December 3, 1923.)

### No. 174.

1. **Shipping ⬅86(2)—Fall of topping lift, killing stevedore, held to raise presumption of negligence, under doctrine of res ipsa loquitur.**

The breaking of a boom and the falling of a topping lift on a ship, resulting in the death of a stevedore, *held* to raise a presumption of shipowner's negligence, under the doctrine of res ipsa loquitur, in failing to keep such equipment in proper condition.

2. **Shipping ⬅86(2)—Presumption of negligence not dispelled by proof that defect in topping lift was not observed.**

That the defective condition of a topping lift on a vessel, which broke and caused the death of a stevedore, had not been observed, was not sufficient to dispel the presumption of shipowner's negligence, where the defect could have been discovered by available means.

3. **Shipping ⬅86(2)—Evidence held to justify finding of shipowner's negligence in failing to inspect topping lift.**

On libel for death of a stevedore, resulting from the falling of boom, and topping lift, evidence that part of the break in the iron band was rusted *held* sufficient to show that there was a visible defect, and to justify finding of negligence in failing to properly inspect the band.

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**4. Shipping ⚙══84(3)—Shipowner's duty to furnish safe appliances to stevedore.**

A shipowner must exercise reasonable care in furnishing reasonable appliances to stevedores for unloading the ship, and must keep the appliances in reasonably safe repair, which includes the duty of making an inspection at proper intervals.

**5. Shipping ⚙══86(3)—Libel against stevedoring company for stevedore's death held properly dismissed.**

On libel for death of stevedore, resulting from falling of a boom on a ship, *held* that, in the absence of evidence that the break was caused by negligence in permitting the draft to catch in the coaming, the libel, as against the stevedoring company, was properly dismissed.

Appeal from the District Court of the United States for the Southern District of New York.

Libel by Anna Pleckaitis, as administratrix, etc., against the Henrik Ostervolze Docking Company, owner of the steamship Marshall, the West India Steamship Company, and Brady & Gioe, Inc. Decree for libelant against the respondent Henrik Ostervolze Docking Company, and dismissing the libel against the West India Steamship Company and Brady & Gioe, Inc. Affirmed.

Burlingham, Veeder, Masten & Fearey, of New York City (M. L. Fearey, of New York City, and B. H. Pollitt, of New Brighton, of counsel), for appellant.

Joseph A. Corbett, of New York City (George F. Hickey, of New York City, of counsel), for libelant appellee.

E. C. Sherwood, of New York City (William L. O'Brion, of New York City, of counsel), for respondent appellees.

Before ROGERS, MANTON, and MAYER, Circuit Judges.

MANTON, Circuit Judge. [1] Peter Pleckaitis, appellee's intestate, was killed on May 16, 1922, while working on the steamship Marshall as a gangwayman in the employ of the appellee Brady & Gioe, Inc., stevedores. At the time they were unloading sugar from No. 4 hold. A starboard boom, which had been raised in place over No. 4 hatch, broke, striking the intestate, causing his death. It was a topping lift, attached to a lug on a band around the top of the starboard king-post, which fell because a ring attached to the band parted from the band. At the time the stevedores were engaged in raising a draft of five bags of sugar each weighing about 325 pounds. The work had been going on about an hour and a half and from 360 to 380 bags were removed from the hold when the topping lift fell. At the time the draft had been lifted only about 3 feet from the bottom of the hold. The band around the top of the king-post was a solid piece of iron about 5 inches in width and an inch thick. The ring or lug was welded to it, and this parted or broke from the iron band. After the accident, the ring was taken to the office of the proctors for the appellant, and it was accounted for until the time of the trial. In the meantime, it was examined by witnesses and experts called by both parties. The king-post is about 25 feet high. It appears that no repairs had been made to this band since the ship was constructed, which was about three years previous to this accident.

. The falling of the topping lift in the manner described raised a presumption of negligence, and the doctrine of res ipsa loquitur applies. Central R. R. Co. v. Peluso (C. C. A.) 286 Fed. 661. In that case this court recently had occasion to review the federal as well as the New York state authorities on this subject. There a crane was so constructed that it could be swung around in a complete circle while mounted on a flat car, and was standing on a track near the water. The deceased was unloading iron ore from a barge moored to the dock, and placing it in cars which were standing on the second track away from the string piece. While thus waiting, his foreman came down on the dock and gave another order to unload. He swung the boom over toward the cars on a third track. The crane was standing idle, with the bucket hanging over the car. The bucket at the time was not moving. It was not raised or lowered. Suddenly the crane turned over backwards into the water and the intestate was drowned. There was expert testimony to the effect that the only thing that could make the crane topple over backwards was the breaking of the boom. There was testimony that, immediately before the crane overturned, the boom with a bucket attached was seen to rise and fall the full length of the boom, two or three times, and that after the accident a piece of wood about 3 feet in length and 6 inches wide was found alongside the bucket, and the side of one of the coal cars looked as if a piece had been "bitten out." The verdict of the jury in favor of the plaintiff was supported by this court. There we said:

"If, in the case at bar, it had been shown that the boom was injured by some external contact, due to the act of some one other than the employer, or by some act of Peluso, then the mere fact of the break of the boom might not have been sufficient, and it would have been incumbent upon plaintiff to show that the defective condition of the boom was due to some act, or failure to act, on the part of the employer, which would exclude the conclusion that the break was due to some act either of Peluso, or of some other person, or to some other cause."

And we said further:

"We may at once state that we are unable to see any justification in reason for failing to apply the correct doctrine of res ipsa loquitur to an action such as that at bar."

In Southern Railway Co. v. Bennett, 233 U. S. 80, 34 Sup. Ct. 566, 58 L. Ed. 860, the Supreme Court said:

"Of course the burden of proving negligence in a strict sense is on the plaintiff throughout, as was recognized and stated later in the charge. The phrase picked out for criticism did not controvert that proposition, but merely expressed in an untechnical way that, if the death was due to a defective instrumentality and no explanation was given, the plaintiff had sustained the burden. The instruction is criticized further as if the judge had said res ipsa loquitur—which would have been right or wrong according to the res referred to."

[2, 3] We think that from the break occurring in the manner described, it presumptively appears that the appellant failed in its duty to keep the band and ring in proper condition. The fact that this defective condition in the band with the ring on it had not been observed is not sufficient to dispel the presumption, if there were means

available by careful examination, to discover the defect. Union Pacific Ry. Co. v. Daniels, 152 U. S. 684, 14 Sup. Ct. 756, 38 L. Ed. 597. In endeavoring to meet this presumption, the appellant took the testimony, by deposition, of its chief officer who said that he was on a trip from Cuba to New York about a week before the accident and that the posts were washed down with soap and water; that he personally climbed the starboard post standing on a rope stretched between the wire stays, looked at the bands, and found no cracks in the band or in the lug. The District Judge, however, said:

"I am not greatly impressed with the value of the deposition of Jentoft [chief officer], who claimed to have inspected the band and eyebolt three or four days prior to the accident on the voyage from Havana to New York. What he said about the number of times the stevedores caused the draft to hit the hatch coamings, and of his warnings, seemed so exaggerated that I could hardly put much faith in his careful inspection. No one can say how painstaking was the inspection which he has said he made at this time."

A reading of this deposition, considered with the kind of examination he must have made while the ship was at sea, with his attention not directly called to the band in question, convinces us, as it did the District Judge, that his testimony is unreliable. The second officer testified that when the ship was in port at Antwerp (two months before the accident) he climbed up the king-post on the starboard side, and says he did not notice any cracks in the band. Apparently this was a mere casual glance, with nothing directing his attention to the band in question, nor did he make any test of the iron band, which cannot be said to be a reasonable inspection by a competent inspector.

The appellee did not rest on the presumption of negligence, but came forward with proof tending to show that the band was rusted at the break, the biggest part of it; that it showed a new and old break immediately after the accident; that at least "half of it was rusted, and the other half was a clean break." An expert testified that he inspected the broken ring, and the band from which the ring had broken, and saw a weld at the center, and there it was defective. The inner part of the lug showed signs of a very old break, with rust and scaled condition. He pointed out that the accumulation of rust scale at the place of the old fracture must have been over a period of at least six months before the time of the break. He expressed an opinion that there would be "an apparent opening into the outside, which was discoverable by ocular inspection." It was conceded that the ring was never properly welded to the band, and that rust on the one side would let the water in, and would cause rust, and would indicate an old break. Another expert testified that the opening which would permit water to get in and cause rust, creating the condition of the old break as discovered afterward, must have existed for a period of six months to a year. The experienced trial judge below in his opinion carefully weighed the testimony and contentions of the parties and observed:

"I have examined the band and lug many times, and am quite convinced that the break on the left side is much more recent than that on the right. I have no doubt that the witnesses for the respondent were correct when they said that there was a clean break on each side. Indeed it seems impossible to suppose, if the right wing of the eyebolt had really broken away as a whole before the time of the accident, that the left could have stood the

strain for any length of time. It does not follow, however, that these witnesses were accurate in saying that the whole length of the right wing at the time of the accident indicated a new break. Looking into the slit on the right side of the band in which the right wing of the eyebolt was inserted, the lower portion of the slit indicates to my eyes an old break, filled with scales of rust that had accumulated some time prior to the superficial rust of the left side. Moreover, the right wing of the eyebolt is, in places, considerably pitted with rust, as the expert Romney pointed out in his testimony, whereas the left side is much cleaner and brighter. * * * I am quite conscious that the result I have reached depends on a course of reasoning based upon facts not entirely free from doubt; but a fatal accident, resulting from a defective appliance, calls for an explanation. I am not satisfied that there was a careful inspection, and I believe that the preponderance of evidence indicates that there must have been a visible defect."

[4] Though the appellees' intestate was not employed by the ship, still there was the duty owed requiring the shipowner to exercise reasonable care in furnishing suitable appliances to the stevedores who were engaged in unloading the ship, and it was incumbent upon them to keep the appliances in use in reasonably safe repair, and this duty included that of making inspections and examinations at proper intervals. Union Pacific v. Daniels, 152 U. S. 684, 14 Sup. Ct. 756, 38 L. Ed. 597; The Emilia S. De Perez, 248 Fed. 480, 160 C. C. A. 490; Neptune S. N. Co. v. Borkmann, 118 Fed. 420, 55 C. C. A. 548; Gorham v. Cunard S. S. Co. (D. C.) 254 Fed. 716; The Howell, 273 Fed. 513; The Bolton Castle, 250 Fed. 403, 162 C. C. A. 473. We think that the finding below that appellant was negligent in its duty that it owed to the appellee's intestate is fully justified by the proofs.

[5] It is argued by the appellant that it was error to dismiss the libel as against the stevedores Brady & Gioe, Inc. The argument proceeds on the theory that, if the hook in which the sling was placed or the draft itself was permitted to catch in the coaming, the strain would in turn be placed on the topping lift, and would be limited only by the power of the winch, thus causing the break in the ring and band. But there is no evidence that the draft was caught in any way when it was being raised, and it is well established that the five bags of sugar which constituted the draft were raised only about 3 feet, and did not come in contract with anything when the break occurred. Liability cannot be imposed on any such supposition.

Decree affirmed.